# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 30, 2025

Lyle W. Cayce
Clerk

No. 23-50874

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

SIDNEY DONNELL KIMBLE,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:21-CR-355-1

Before SMITH, GRAVES, and DUNCAN, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

Sidney Kimble has been convicted of two drug-trafficking felonies. After serving his time for each offense, he was found in possession of a handgun and charged and convicted under 18 U.S.C. § 922(g)(1), which bars felons from possessing firearms. His appeal posits that prohibiting him from keeping or bearing arms for the remainder of his life violates the Second Amendment. Because disarming drug traffickers accords with the nation's history and tradition of firearm regulation, we affirm Kimble's conviction.

No. 23-50874

## I.

Kimble pleaded *nolo contendere* to manufacturing or delivering a controlled substance after officers found him carrying crack cocaine, marihuana, yellow pills of an unidentified substance, and over $1,000 in cash. He was sentenced to six years' confinement for that state-level felony but served just one year. His parole term expired on January 5, 2018.

In 2015, Kimble sold a confidential informant approximately 139 grams of crack cocaine. He pleaded guilty to a federal felony: possession with intent to distribute a detectable quantity of cocaine. He was sentenced to 18 months in prison followed by four years of supervised release. He was released early in July 2016, at which point his four years of supervised release commenced. But after violating his terms of release by cheating on a drug test, he was re-imprisoned for 12 months beginning on January 1, 2018. The order remanding Kimble to prison stated that upon his release, "no supervised release [would] follow." He was again released early on July 6, 2018.

Kimble's present appeal stems from his arrest on July 16, 2021, when law enforcement agents attempted to stop him for outstanding warrants for possession of a controlled substance and being a felon in possession of a firearm. As Kimble fled, officers observed him discard a handgun from his waistband. The officers caught up, arrested Kimble, and recovered the gun. He was charged with violating § 922(g)(1), the felon-in-possession statute.[1]

After several continuances, Kimble moved to dismiss the indictment in March 2023 on the ground that § 922(g)(1) was unconstitutional both facially and as applied to him. The district court denied Kimble's motion to dismiss because, in its view, *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), did not overrule binding Fifth Circuit precedent holding

---

[1] For readability, we sometimes truncate the statute's citation to "(g)(1)."

No. 23-50874

(g)(1) constitutional under the Second Amendment. Kimble then pleaded guilty without the benefit of a plea agreement. The district court accepted the plea in August 2023 but agreed that by pleading guilty, Kimble was not giving up his right to appeal the constitutionality of the statute of conviction in light of *Bruen*.

As with all constitutional questions, we consider Kimble's as-applied challenge to (g)(1) *de novo*. *United States v. Daniels*, 124 F.4th 967, 971 (5th Cir. 2025, *petition for cert. filed* (June 5, 2025) (No. 24-1248).

II.

Title 18 U.S.C. § 922(g)(1) makes it unlawful for an individual to possess a firearm if he "has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year." Kimble contends that, as applied to him, (g)(1) violates the Second Amendment. To survive Kimble's challenge, the government must demonstrate that the nation has a tradition of disarming someone with a criminal history analogous to his. *See United States v. Diaz*, 116 F.4th 458, 467 (5th Cir. 2024), *cert. denied*, 2025 U.S. LEXIS 2453 (U.S. June 23, 2025). We first (A) expound the relevant legal framework and then (B) address the government's two arguments that (g)(1)'s lifelong ban on Kimble's firearm possession complies with the Second Amendment.[2]

A.

The Second Amendment guarantees that "the right of the people to

---

[2] In addition to his as-applied challenge, Kimble raises two points that he acknowledges are foreclosed by precedent. First, he maintains that § 922(g)(1) is facially unconstitutional. That position is refuted by *Diaz*, 116 F.4th at 471–72. Kimble also avers that (g)(1) exceeds Congress's power under the Commerce Clause. That theory is similarly foreclosed. *See United States v. Jones*, 88 F.4th 571, 573 (5th Cir. 2023) (per curiam), *cert. denied*, 144 S. Ct. 1081 (2024).

keep and bear Arms[] shall not be infringed." U.S. CONST. amend. II. In 2008, the Supreme Court recognized that that amendment codified a pre-existing, individual right "to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). But that right "is not unlimited." *Id.* at 626. The Court noted that "longstanding prohibitions on the possession of firearms by felons and the mentally ill," for example, are "presumptively lawful." *Id.* at 626–27 & n.26.

The Supreme Court "revisited and refined" *Heller* over a decade later, instructing courts to employ a two-step framework to analyze whether a particular firearm regulation violates an individual's right to keep and bear arms. *Diaz*, 116 F.4th at 463; *see Bruen*, 597 U.S. at 17. First, a court asks whether the Second Amendment's plain text covers the behavior the government seeks to regulate, in which event the Constitution presumptively protects that conduct. *Bruen*, 597 U.S. at 24. Second, if the individual's actions are covered by the amendment's text, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* Only if the government meets that burden "may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (quotation omitted).[3]

As to the first inquiry, "[t]he plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)." *Diaz*, 116 F.4th at 467. That is because convicted felons are "unequivocally among 'the people' protected by the Second Amendment." *United States v. Schnur*, 132 F.4th 863, 867 (5th

---

[3] The Supreme Court reaffirmed *Bruen*'s framework two years later in *United States v. Rahimi*, 602 U.S. 680 (2024). There, the Court noted that the government need not identify a "historical *twin*" to justify a modern-day regulation, or even a single analogous historical law, because multiple historical analogues "[t]aken together" can demonstrate that a modern regulation has a sufficiently analogous "why" and "how" to historical firearms restrictions to satisfy the *Bruen* test. *See Rahimi*, 602 U.S. at 698–99.

Cir. 2025) (citing *Diaz*, 116 F.4th at 466). The government thus has the burden of showing that disarming an individual based on his felon status is "consistent with the Nation's historical tradition." *Id.*

Our post-*Bruen* framework for assessing whether a § 922(g)(1) conviction accords with the nation's historical tradition was first set out in *Diaz*, 116 F.4th at 467, in which a defendant with a felony conviction for vehicle theft challenged his (g)(1) conviction as inconsistent with the Second Amendment. In *Diaz*, we began by recognizing that *Bruen* abrogated our precedents upholding the constitutionality of (g)(1) in all its applications. *See id.* at 465. We thus no longer reject Second Amendment challenges to (g)(1) categorically, instead permitting "as-applied challenges by defendants with different predicate convictions" from Diaz's convictions. *Id.* at 470 n.4.[4] The question each as-applied challenge raises is whether "the government [can] demonstrate that the Nation has a longstanding tradition of disarming someone with a criminal history analogous to" the challenger. *Id.* at 467.

Our caselaw recognizes three categories of offenses that doom a defendant's as-applied challenge to (g)(1): theft, violence, and violating the terms of one's release by possessing arms while on parole. First, in *Diaz*, we held that the defendant's as-applied challenge failed because Founding-era analogues to Diaz's predicate felony such as horse theft were subject to the death penalty, conveying that "our country has a historical tradition of severely punishing people like Diaz who have been convicted of theft." *Id.* at 468–69. Therefore, the lesser punishment of lifelong disarmament imposed by (g)(1) accorded with the Second Amendment. *Id.* at 469–70.

Second, in *Schnur*, 132 F.4th at 868, we considered an as-applied

---

[4] That approach contrasts with some other circuits. *See Schnur*, 132 F.4th at 871 (Higginson, J., concurring) (listing cases).

challenge to a (g)(1) conviction brought by a defendant whose predicate felonies included "aggravated battery causing great bodily injury." We upheld the conviction because "our caselaw suggests that there are historical analogues demonstrating our Nation's longstanding tradition of disarming persons with a violent criminal history analogous to Schnur's." *Id.* at 869 (citing, *inter alia*, *United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024) (per curiam)). We thus held that "Schnur's felony conviction for a 'crime of violence' indicates that he poses a threat to public safety and the orderly functioning of society," and the "regulation of such person's ability to possess a firearm" accords with the nation's history of punishment of those who have been convicted of violent offenses. *Id.* at 870.

Finally, in *United States v. Giglio*, we upheld a (g)(1) conviction where the defendant was found armed while still serving his sentence on supervised release—again because, historically, "convicts could be required to forfeit their weapons and were prevented from reacquiring arms until they had finished serving their sentences." 126 F.4th 1039, 1044 (5th Cir. 2025) (citation omitted); *see also United States v. Contreras*, 125 F.4th 725, 732–33 (5th Cir. 2025).

In summary, our caselaw establishes that if a defendant's predicate felony involves theft or violence, his as-applied challenge to § 922(g)(1) will fail. Similarly, if a defendant is caught possessing a gun while out on supervised release for a prior felony sentence, his as-applied challenge will also fail.

The novel question raised by Kimble's appeal is whether a predicate drug-trafficking felony also justifies permanent disarmament under (g)(1) even after the defendant has served his full sentence. We must hold the government to its heavy burden of showing that our history supports Kimble's lifetime disarmament under (g)(1), because the Second Amendment "is not 'a second-class right.'" *Bruen*, 597 U.S. at 70 (quoting *McDonald v. City of*

No. 23-50874

*Chicago*, 561 U.S. 742, 780 (2010)).

## B.

The government advances two theories to support its contention that § 922(g)(1)'s lifetime disarmament is constitutional as applied to Kimble. First, the government suggests that Kimble's predicate felony is analogous to Founding-era felonies punishable by death or estate forfeiture such as the knowing receipt of a stolen horse or the forgery of public securities. We reject that notion because it stretches the analogical reasoning prescribed by *Bruen* too far. Next, the government avers that Kimble can be disarmed for life because drug trafficking is an intrinsically dangerous felony, and legislatures can disarm those who pose a threat to the safety of others. We accept that approach and hold that (g)(1) is constitutional as applied to defendants with predicate felonies for drug-trafficking offenses because of the intrinsic violence of the drug trade.

### 1.

In *Diaz*, 116 F.4th at 469–70, we held that if a felon's predicate offense "would have led to capital punishment or estate forfeiture" at the Founding, then § 922(g)(1)'s permanent disarmament passes constitutional muster because it "fits within this tradition of serious and permanent punishment." The government invokes that ruling to urge that Kimble's (g)(1) conviction is constitutional because his drug-trafficking convictions echo historical crimes that "carried serious and permanent punishment at the founding." Specifically, the government invokes three types of crimes punishable by death or estate forfeiture: (1) the knowing receipt of a stolen horse,[5] (2) theft

---

[5] *See* 6 William Waller Hening, The Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619, p. 130 (1819) (1748 law). That law provided that "any person or persons [who] shall receive, or buy, any horse that shall be feloniously

of mail,[6] and (3) counterfeiting and forgery of public securities.[7] The government maintains that those laws "establish a historical tradition of severely punishing people convicted of crimes involving the creation, possession, or distribution of illicit goods."[8]

To succeed, the government must show that the historical laws it offers as analogues are "relevantly similar" to § 922(g)(1), meaning the historical laws and the challenged regulation share a common "why" and "how." *Daniels*, 124 F.4th at 973. In other words, the government's proffered laws must both (1) address a comparable problem (the "why") and (2) place a comparable burden on the right-holder (the "how"). *Id.* Under *Diaz*, 116 F.4th at 469, laws punishing serious crimes with death or estate forfeiture satisfy the "how" inquiry because those laws "achieved their goals

---

taken, or stolen, from any other person, knowing the same to be stolen; or shall harbour or conceal any horse-stealer, knowing him, her, or them to be so, such person or persons . . . shall incur and suffer the pain of death, as a felon convict." *Id.*

[6] *See* An Act to Establish the Post Office and Post Office and Post Roads within the United States, § 17, 1 Stat. 232, 237 (1792). That law provided that "if any person or persons shall rob any carrier of the mail of the United States, . . . such offender or offenders shall, on conviction thereof, suffer death." *Id.*

[7] *See, e.g.*, An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112, 115 (1790) ("[I]f any person or persons shall falsely make, alter, forge or counterfeit, or cause or procure to be falsely made, altered, forged, or counterfeited, or willingly act or assist in the false making, altering, forging or counterfeiting any certificate, indent, or other public security of the United States, . . . with intention to defraud any person, knowing the same to be false, altered, forged or counterfeited, and shall be thereof convicted, every such person shall suffer death."); Act of Apr. 18, 1786, 2 Laws of the State of New York 253, pp. 260–61 (1886) (punishing counterfeiting bills of credit with estate forfeiture, hard labor, and branding); 9 HENING, *supra* note 5, p. 302 (1821) (1777 law) (punishing forgery with estate forfeiture).

[8] At oral argument, the government referenced additional laws concerning tobacco smuggling. We need not consider that proffered analogue because new arguments or legal theories raised for the first time at oral argument are forfeited. *See Shah v. Azar*, 920 F.3d 987, 994 n.19 (5th Cir. 2019).

No. 23-50874

by permanently punishing offenders, as does § 922(g)(1)."

The closer question is whether the proffered laws pass the "why" test—that is, whether they "address a comparable problem" as does (g)(1). *Daniels*, 124 F.4th at 973. Answering *that* question—*i.e.*, "deciding whether a conceptual fit exists between the old law and the new"—"requires the exercise of both analogical reasoning and sound judgment." *Id.* (quoting *United States v. Connelly*, 117 F.4th 269, 274 (5th Cir. 2024)).

We begin by considering the purpose of the laws underlying Kimble's predicate offenses. *See Diaz*, 116 F.4th at 467. Kimble's 2012 felony conviction resulted from his violation of the Texas Controlled Substances Act, Tex. Health & Safety Code Ann. §§ 481.112(a), 481.115(a). The purpose of that law, first enacted in 1973, is "to prevent drug trafficking and drug dealing." *One 1980 Pontiac v. State*, 707 S.W.2d 881, 882 (Tex. 1986). Similarly, Kimble's 2015 felony conviction resulted from his possession with intent to distribute a controlled substance in violation of the federal Controlled Substances Act ("CSA"), 21 U.S.C. § 841(a)(1) & (b)(1)(C). One of the "main objectives" of that statute was "to control the legitimate and illegitimate traffic in controlled substances." *Gonzales v. Raich*, 545 U.S. 1, 12 (2005). As applied to Kimble, then, the "problem" that the laws underlying Kimble's (g)(1) conviction seek to address is the use and sale of addictive drugs. *Daniels*, 124 F.4th at 973.[9]

The historical laws invoked by the government, by contrast—namely,

---

[9] *See also* David E. Pozen, The Constitution of the War on Drugs 12 (2024). Professor Pozen notes that, one year after signing the CSA into law, President Nixon declared that drug abuse was "America's public enemy number one," a statement often seen as inaugurating the "war on drugs." *Id.* (footnote omitted). The CSA in turn built on President Eisenhower's "new war on narcotics addiction" and the Narcotics Control Act of 1956, a forerunner to the CSA that stiffened drug-trafficking penalties. *Id.*

No. 23-50874

colonial Virginia's law making it a felony knowingly to receive a stolen horse, and other laws punishing mail theft and counterfeiting with death or estate forfeiture—all concern theft, fraud, or deceit. The government avers that the modern and historical laws both advance a common goal of eliminating traffic in illicit goods, and that is true in a sense: Legislatures have deemed both stolen horses and vials of drugs unlawful items. But extracting the government's proposed maxim from those historical laws—that legislatures can severely punish any individual caught with illicit goods—hinges on engaging in an unduly high level of generality. Under the government's theory, Congress could outlaw the possession of any quotidian object and then claim that all those caught possessing it lose their Second Amendment rights forever. We "must be careful not to read a principle at such a high level of generality that it waters down the right," *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring), and "a shifting benchmark" such as possession of any item deemed illicit "should not define the limits of the Second Amendment," *Diaz*, 116 F.4th at 469.[10]

In short, the government's proffered historical analogues are not "relevantly similar" to the modern state and federal drug-trafficking laws underlying Kimble's predicate felony convictions. *Bruen*, 597 U.S. at 29. The government is not required to identify "a historical *twin*" to justify modern-day gun regulations. *Id.* at 30. But its contention—that historical laws severely

---

[10] *See also United States v. Jackson*, 121 F.4th 656, 660 (8th Cir. 2024) (Stras, J., dissenting from the denial of reh'g en banc) (questioning what would happen if a legislature made the failure to return a library book a felony). Under the government's theory, if a state enacted such a law, anyone caught with an overdue library book could be disarmed for life because such a book would now be contraband. Detective Bookman's passion for bringing library scofflaws to justice notwithstanding, we are skeptical that Jerry Seinfeld could suffer such a fate consistent with the Second Amendment. *See Seinfeld: The Library Cop* (NBC television broadcast Oct. 16, 1991), available at https://www.youtube.com/watch?v=D9tP9fI2zbE.

punishing recipients of stolen goods or counterfeit securities justifies lifetime disarmament for individuals today convicted of selling illicit drugs—stretches the analogical reasoning prescribed by *Bruen* and *Rahimi* too far. *See Connelly*, 117 F.4th at 282.

2.

The government next reasons that the nation's history establishes a tradition of disarming those whose past criminal conduct evinces a special danger of misusing firearms. Kimble's record of drug trafficking, the government avers, underscores that he is the sort of dangerous individual that legislatures have long disarmed. We agree.

The Second Amendment allows Congress to disarm classes of people it reasonably deems dangerous, and § 922(g)(1)'s prohibition on gun possession by individuals convicted of drug-trafficking felonies enacts such a disarmament regime consistent with *Bruen*'s "why" and "how" test.

Class-wide disarmament accords with both history and precedent. "[G]overnments in England and colonial America long disarmed groups that they deemed to be dangerous." *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024). Because "[s]uch populations, the logic went, posed a fundamental threat to peace and thus had to be kept away from arms . . . governments labeled whole classes as presumptively dangerous." *Id.* We acknowledged that history in *Connelly*, 117 F.4th at 278, concluding that the "undeniable throughline" in our nation's history is that "Founding-era governments took guns away from those perceived to be dangerous." Further, "history and tradition support Congress's power to strip certain *groups* of" the right to bear arms. *Diaz*, 116 F.4th at 466 (emphasis added) (quoting *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting)). In short, "Congress is entitled to make categorical judgments." *Vidal v. Elster*,

602 U.S. 286, 319 (2024) (Barrett, J., concurring in part).[11]

But that is not the end of the analysis. Although Congress can label certain classes of people—such as felons—dangerous, courts cannot grant those determinations blanket deference because the "shifting benchmark" of felony status "should not define the limits of the Second Amendment." *Diaz*, 116 F.4th at 469.[12] Instead, judges must determine whether the government has identified a "class of persons at the Founding who were 'dangerous' for reasons comparable to" those Congress seeks to disarm today. *Connelly*, 117 F.4th at 278. In other words, the question before us is a familiar one: Is a law that disarms for life individuals with drug-trafficking felonies consistent with the nation's history of firearm regulation?

Once again, history and precedent suggest the answer is yes. The government invokes much of the same historical evidence that it did in *Connelly* to support its view that "persons whom Congress deems 'dangerous' can have their Second Amendment rights stripped," *Connelly*, 117 F.4th at 277—namely, English laws disarming political and religious dissidents and American statements and practices suggesting that dangerous individuals could lose their Second Amendment rights.[13] We rejected those analogies in *Con-*

---

[11] *See also Range v. Att'y Gen. United States*, 124 F.4th 218, 255–67 (3d Cir. 2024) (Krause, J., concurring) (cataloguing categorical disarmament laws from the English Restoration to the American Gilded Age).

[12] *See also Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting) (noting that because "extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label," courts "must not reflexively defer to that label when a fundamental right is at stake").

[13] *See, e.g.*, City of London Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13 (English law disarming potential dissidents); An Act for Constituting a Council of Safety (Oct. 11, 1777), 1777 N.J. Laws ch. 40, § 20, p. 90 (New Jersey law permitting the disarmament of those deemed dangerous); 2 Bernard Schwartz, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 665 (1971) (proposed amendment presented at the Pennsylvania ratifying convention stating that "no law shall be passed for disarming the people or any of them

No. 23-50874

*nelly* because marihuana users like the defendant in that case were not "dangerous" for reasons comparable to those targeted by the government's proffered analogues. *See id.* at 278.

But the government's analogues are a closer fit for drug traffickers than for occasional drug users. The English history invoked by the government suggests that while "good subjects" retained their rights to keep and bear arms, those judged "dangerous to the Peace of the Kingdom" could be disarmed.[14] The American colonies similarly empowered officials to "take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements and Ammunition which they own or possess."[15] The constitutional ratification debates also reflected the understanding that legislatures could disarm dangerous persons. As Justice Barrett has observed, the Pennsylvania and Massachusetts ratifying conventions convey that "the scope of founding-era understandings regarding categorical exclusions from the enjoyment of the right to keep and bear arms . . . is about threatened violence and the risk of public injury." *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting). That same concern "animated English and

---

unless for crimes committed, or real danger of public injury from individuals"). English history is relevant because the Second Amendment "was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors." *Heller*, 554 U.S. at 599 (quotations omitted).

[14] *See* Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 NOTRE DAME L. REV. 397, 401–405 (2019) (explaining that the Militia Act of 1662, which permitted the seizure of arms from those dangerous to the public safety, "continued unabated" even after England's Glorious Revolution); *see also Rahimi*, 602 U.S. at 694 (invoking the Militia Act of 1662 as evidence of the government's ability to disarm the dangerous).

[15] An Act for Constituting a Council of Safety (Oct. 11, 1777), *supra* note 13. *See also Williams*, 113 F.4th at 654 (citing that law and concluding that, for the American colonists, "disarming dangerous loyalists was a necessary strategy to preserve order").

early American restrictions on arms possession." *Id.*

The "undeniable throughline" that *Connelly* recognized in our history—that "Founding-era governments took guns away from those perceived to be dangerous," *Connelly*, 117 F.4th at 278—accords with (g)(1)'s rationale for disarming Kimble. Like legislatures in the past that sought to keep guns out of the hands of potentially violent individuals, Congress today regards felon drug traffickers as too dangerous to trust with weapons.

That supposition is well supported by caselaw. The Supreme Court has long recognized "that drugs and guns are a dangerous combination." *Smith v. United States*, 508 U.S. 223, 240 (1993).[16] This circuit has also credited testimony that "drugs and guns are commonly found together and that drug dealers use guns to protect their business because of the *inherent violence* of the trade." *United States v. Yanez Sosa*, 513 F.3d 194, 202 (5th Cir. 2008) (emphasis added). Other circuits have similarly acknowledged that "drug dealing is notoriously linked to violence." *United States v. Torres–Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (citations omitted).[17] For those reasons, numerous judges and scholars have suggested that disarming drug dealers under (g)(1) "makes sense because their past crimes were inherently danger-

---

[16] *See also Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring in part and concurring in the judgment) (calling the contention that drug-trafficking crimes are "nonviolent and victimless" "false to the point of absurdity").

[17] *See also, e.g.*, *United States v. Harper*, 766 F.3d 741, 746 (7th Cir. 2014) ("[T]he possession of a firearm by a felon in the context of another offense such as drug trafficking is inherently more dangerous than mere possession absent such activity."); *United States v. Barton*, 633 F.3d 168, 174 (3d Cir. 2011) ("[O]ffenses relating to drug trafficking and receiving stolen weapons are closely related to violent crime."); *United States v. Ruiz*, 412 F.3d 871, 881 (8th Cir. 2005) ("Firearms are tools of the drug trade due to the dangers inherent in that line of work."); *United States v. Diaz*, 864 F.2d 544, 549 (7th Cir. 1988) ("[T]he illegal drug industry is, to put it mildly, a dangerous, violent business.").

No. 23-50874

ous." *Folajtar*, 980 F.3d at 922 (Bibas, J., dissenting).[18]

The Legislative and Executive Branches also associate drug trafficking with violence. In 1986, Congress added the term "drug trafficking crime" to a related provision in § 922(g)(1)'s statutory scheme "to enhance the ability of law enforcement to fight violent crime and narcotics trafficking."[19] Before that amendment, the provision had referenced only "a crime of violence," but on account of "confusion in the courts of appeals about whether drug trafficking constituted a 'crime of violence' under the statute," the White House requested that Congress "amend the language of [18 U.S.C.] § 924 to include drug crimes in light of the fact that criminals involved in drug trafficking may often carry or use firearms during the commission of drug-related felonies."[20] Congress complied, and courts thereafter understood the amended law as "an effort to combat the dangerous combination of drugs and guns." *Muscarello v. United States*, 524 U.S. 125, 132 (1998) (quotations

---

[18] *See also Williams*, 113 F.4th at 663 ("A person convicted of a crime is 'dangerous,' and can thus be disarmed, if he has committed . . . a crime that inherently poses a significant threat of danger, including . . . drug trafficking."); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 730 (2009) (suggesting that drug trafficking crimes are "leading candidates" to be added to the category of "crimes of violence" that have traditionally led to the perpetrator's disarmament).

[19] H.R. Rep. No. 99-495, at 1 (1986) (summarizing the purpose of the Federal Firearms Law Reform Act of 1986). The amended provision established a mandatory minimum sentence for "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm." 18 U.S.C. § 924(c)(1)(A).

[20] Lynn Marsella, *Something About Carry: Supreme Court Broadens the Scope of 18 U.S.C. 924(c)*, 89 J. CRIM. L. & CRIMINOLOGY 973, 975 (1999) (quotation omitted). John Bolton, the Assistant Attorney General at the time, requested that Congress amend the law because a recent decision held that § 924(c) "was not intended to apply to narcotics offenses." 132 Cong. Rec. S. 7941 (1986) (letter from John R. Bolton to Sen. Bumpers) (citing *United States v. Diaz*, 778 F.2d 86, 88 (2d Cir. 1985)). One Senator thus described the amended law as "ma[king] clear Congress's desire to 'treat armed drug trafficking as seriously as we do other armed felonies threatening public safety.'" Marsella, *supra*, at 975–76 (quoting 131 Cong. Rec. S. 34124 (1985) (statement of Sen. D'Amato)).

No. 23-50874

omitted).

In short, the Legislative, Executive, and Judicial Branches agree that drug trafficking is an inherently dangerous activity, and Congress has responded to that threat by disarming convicted drug traffickers via § 922(g)(1). That decision does not violate the Second Amendment. Because Kimble's predicate felony conviction "indicates that he poses a threat to public safety and the orderly functioning of society," his (g)(1) conviction is "consistent with this Nation's historical tradition of firearm regulation and punishment of people who have been convicted of violent offenses." *Schnur*, 132 F.4th at 870 (quotation omitted).[21]

\* \* \*

We "conclude only by emphasizing the narrowness" of our decision. *Daniels*, 124 F.4th at 976. Kimble's conviction accords with the Second Amendment because Congress can categorically disarm individuals convicted of violent felonies like drug trafficking. That conclusion does not depend on an individualized assessment that Kimble is dangerous. We thus do not embrace the view that courts should "look beyond" a defendant's predicate conviction "and assess whether the felon's history or characteristics make him likely to misuse firearms." *Contra Pitsilides v. Barr*, 128 F.4th 203, 211–12 (3d Cir. 2025) (quotation omitted). The relevant consideration is a defendant's "prior convictions that are punishable by imprisonment for a term exceeding one year," not unproven conduct charged contemporaneously

---

[21] As should be clear from our review of the statutory text, history, and subsequent construction of §§ 922(g)(1) and 924(c), our decision does not prescribe blanket deference to Congress's determination that anyone convicted of a felony is *per se* dangerous. Although legislatures may be entitled to some deference as to where the line between dangerous and nondangerous felonies is properly drawn, courts must "police the outer bounds of proper legislative discretion." *See* William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 NOTRE DAME L. REV. 1467, 1511 n.264 (2024).

16

with a defendant's (g)(1) indictment or prior conduct that did not result in a felony conviction. *Diaz*, 116 F.4th at 467 (quotation omitted).

Kimble's predicate convictions for drug trafficking convey that he belongs to a class of dangerous felons that our regulatory tradition permits legislatures to disarm. On that basis, Kimble's § 922(g)(1) conviction is AFFIRMED.

No. 23-50874

JAMES E. GRAVES, JR., *Circuit Judge*, concurring in part and in the judgment.

Based on the facts of Kimble's case, I agree with the majority that Kimble's conviction should be affirmed. However, I disagree with the majority's determination that it need not conduct an individualized assessment pursuant to his as applied challenge. Thus, I respectfully concur in part and in the judgment.

The majority affirms Kimble's conviction "[b]ecause disarming drug traffickers accords with the nation's history and tradition of firearm regulation." In so doing, the majority states that it rejects the government's argument that Kimble's predicate felony is analogous to Founding-era felonies punishable by death or estate forfeiture because it stretches the analogical reasoning prescribed by *Bruen* too far. Instead, the majority accepts the government's argument that drug trafficking is an intrinsically dangerous or violent felony. The majority concludes that 18 U.S.C. § 922(g)(1) "is constitutional as applied to defendants with predicate felonies for drug trafficking offenses because of the intrinsic violence of the drug trade."

In its discussion of whether drug traffickers are a class of people deemed dangerous and historically disarmed, the majority states that "Congress today regards felon drug traffickers as too dangerous to trust with weapons," and sets out various cases as support for such a proposition. That authority includes the following pre-*Bruen* cases:

- *Smith v. United States*, 508 U.S. 223, 240 (1993). This case involved a conviction under 18 U.S.C. § 924(c)(1), rather than § 922(g)(1). The issue was whether the trade of an automatic weapon for cocaine was considered the use of a firearm during a drug trafficking crime for purposes of that statute. The portion quoted by the majority comes from the following sentence: "When Congress enacted the current

No. 23-50874

version of § 924(c)(1), it was no doubt aware that drugs and guns are a dangerous combination." *Id.* at 240. The Supreme Court further said that Congress would have no reason to intend for courts "to draw a fine metaphysical distinction between a gun's role in a drug offense as a weapon and its role as an item of barter; it creates a grave possibility of violence and death in either capacity." *Id.* The significant factor was a gun's actual role in a drug trafficking offense.

- *United States v. Yanez Sosa*, 513 F.3d 194, 202 (5th Cir. 2008). This case also involved a conviction for possession of a firearm(s) in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c)(1)(A), rather than § 922(g)(1), and the actual presence of a gun(s) in a drug trafficking crime.[1] *Id.* at 198, 202. Significantly, this court also reiterated there that, "[t]he critical question, therefore, is whether a particular defendant possessed the firearm in furtherance of the drug trafficking offense, not whether drug dealers generally use guns to protect themselves and their drugs." *Id.* at 202 (internal marks and citation omitted). Further, the portion quoted by the majority was actually the court's recitation "in substance" of the testimony rather than the actual testimony. *Id.*

- *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011). While the First Circuit did say that "drug dealing is notoriously linked to violence," this was also a case where the defendant was still dealing drugs, i.e., heroin and cocaine, which were found in the room with the loaded gun. *Id.* at 112-13, 115.

- *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 922 (3d Cir. 2020) (Bibas, J. dissenting). As acknowledged by the majority, it relies on a statement from the dissenting opinion. Further, this case involved a challenge to the application of 18 U.S.C. § 922(g)(1) to an

---

[1] Sosa also had a count for possession of a firearm by an illegal alien under 18 U.S.C. §§ 922(g)(5) and 924(a)(2).

19

No. 23-50874

individual convicted of tax fraud. Regardless, a post-*Bruen* Third Circuit case is discussed below.

- *Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991). The majority references a separate opinion in which Justice Kennedy called the contention that drug trafficking crimes are nonviolent "false to the point of absurdity." *Id.* (Kennedy, J., concurring in part and concurring in the judgment). This statement was in reference to a defendant's Eighth Amendment disproportionate sentence claim when he was convicted of possession with intent of over 1.5 pounds of pure cocaine which would yield some "32,500 and 65,000 doses." *Id.* Also, Justice Kennedy went on to discuss how "drug users" commit crime to buy more drugs or "because of drug-induced changes in physiological functions, cognitive ability, and mood," etc. *Id.* This pertains to additional discussion below regarding this court's attempt to distinguish between drug users and drug traffickers.

- *United States v. Harper*, 766 F.3d 741 (7th Cir. 2014). The reference is to the statement that, "the possession of a firearm by a felon in the context of another offense such as drug trafficking is inherently more dangerous than mere possession absent such activity." *Id.* at 747. The remainder of that sentence said: "[A]nd that such a pairing elevates the danger of such firearm being actually used." *Id.* In other words, possessing a firearm *while* committing a drug trafficking offense is inherently more dangerous than merely possessing a firearm or even merely possessing drugs. It is the "pairing" that "elevates the danger." *Id.*

- *United States v. Barton*, 633 F.3d 168, 174 (3d Cir. 2011). The reference is to the statement that "offenses relating to drug trafficking and receiving stolen weapons are closely related to violent crime." *Id.* Notwithstanding that Barton had both drug and gun convictions, the court also significantly reiterated that "[t]o raise a successful as-applied challenge, Barton must present facts about himself and his background that distinguish his circumstances." *Id.* Additionally, a post-*Bruen* Third Circuit case is discussed below.

No. 23-50874

- *United States v. Ruiz*, 412 F.3d 871, 881 (8th Cir. 2005). The majority references a statement that "[f]irearms are tools of the drug trade due to the dangers inherent in that line of work." *Id.* But the context of the statement reveals that multiple guns and ammunition were discovered during searches of various locations pursuant to a drug trafficking case. The court was analyzing whether the evidence of the guns should be excluded based on arguments that they had no connection to the drug activity. *Id.*

- *United States v. Diaz*, 864 F.2d 544, 549 (7th Cir. 1988). The relevant conviction in this case was use of a firearm in relation to the commission of a drug trafficking crime in violation of § 924(c)(1).

These pre-*Bruen* cases neither provide controlling authority nor are they sufficiently similar to provide persuasive authority for the majority's conclusion that it need not conduct an individualized assessment. The majority also cites *Williams*, 113 F.4th 637, which was post-*Bruen*. However, the quoted portion must be read in context. In that case, the Sixth Circuit reiterated that "history reveals that legislatures may disarm groups of people, like felons, whom the legislature believes to be dangerous—*so long as* each member of that disarmed group has an opportunity to make an individualized showing that he himself is not actually dangerous." *Id.* at 663 (emphasis added). The court went on to say:

> A person convicted of a crime is "dangerous," and can thus be disarmed, if he has committed (1) a crime "against the body of another human being," including (but not limited to) murder, rape, assault, and robbery, or (2) a crime that inherently poses a significant threat of danger, including (but not limited to) drug trafficking and burglary. *An individual in either of those categories will have a very difficult time, to say the least, of showing he is not dangerous.*

*Williams*, 113 F.4th at 663 (emphasis added to reflect that even someone convicted of a drug trafficking offense would have the opportunity to show

he is not dangerous). The Sixth Circuit there also said that "district courts need not find a 'categorical' match to a specific common-law crime to show that a person is dangerous." *Williams*, 113 F.4th at 663. Instead "district courts should make fact-specific dangerousness determinations after taking account of the unique circumstances of the individual, including details of his specific conviction." *Id.* "Finally, when considering an individual's dangerousness, courts may evaluate a defendant's entire criminal record— not just the specific felony underlying his section 922(g)(1) prosecution." *Id.*

Citing *United States v. Daniels (Daniels II)*, 124 F.4th at 976, the majority emphasizes "the narrowness" of its decision and concludes that "Kimble's conviction accords with the Second Amendment because Congress can categorically disarm individuals convicted of violent felonies like drug trafficking."[2] The majority then states "[t]hat conclusion does not depend on an individualized assessment that Kimble is dangerous. We thus do not embrace the view that courts should 'look beyond' a defendant's predicate conviction 'and assess whether the felon's history or characteristics make him likely to misuse firearms.' *Contra Pitsilides v. Barr*, 128 F.4th 203, 211-12 (3d Cir. 2025)) (quotation omitted)." The majority further opines that the relevant consideration is simply the defendant's "'prior convictions that are punishable by imprisonment for a term exceeding one year,' not unproven conduct charged contemporaneously with a defendant's (g)(1) indictment or prior conduct that did not result in a felony

---

[2] In *Daniels I*, this court said "[w]e conclude only by emphasizing the narrowness that holding" that Daniel's conviction under § 922(g)(3) is "inconsistent with our 'history and tradition' of gun regulation.'" *United States v. Daniels (Daniels I)*, 77 F.4th 337, vacated and remanded, 144 S.Ct. 2707 (2024). On remand, this court concluded that § 922(g)(3) was unconstitutional as applied to Daniels unless the government was able to show that he was disarmed for something other than occasional or habitual marijuana use. *Daniels II*, 124 F.4th at 975. This court also reiterated the "narrowness" of the decision. *Id.* at 976.

conviction." (citing *United States v. Diaz*, 116 F.4th 458, 467 (5th Cir. 2024)). But, in *Diaz*, this court was merely quoting the relevant statute in the initial determination of whether there was a historical analogue, as follows: "For the purposes of assessing Diaz's predicate offenses under § 922(g)(1), we may consider prior convictions that are 'punishable by imprisonment for a term exceeding one year.' *See* § 922(g)(1)." *Id.* at 467. The *Diaz* court said nothing about unproven or prior conduct, and it was not assessing whether Diaz was dangerous.

While the majority acknowledges its disagreement with the Third Circuit in *Pitsilides*, it is also in disagreement with the Sixth Circuit, as discussed above in *Williams*. The majority cites no authority in support of rejecting an individual assessment. The majority concludes that there is no analogous Founding-era felony to support disarmament. Further, violence is not an element of possession with intent. Yet the majority then makes the blanket determination that drug trafficking is an intrinsically dangerous felony, and § 922(g)(1) is "constitutional as applied to defendants with predicate felonies for drug-trafficking offenses because of the intrinsic violence of the drug trade." Then as support, the majority largely relies on pre-*Bruen* cases involving both drugs and guns, except for the post-*Bruen* cases that say there should be an individual assessment that considers the record in determining dangerousness that it now explicitly rejects.

As the majority acknowledges, this court concluded that 18 U.S.C. § 922(g)(3) could not constitutionally apply to a defendant based solely on "habitual or occasional drug use." *See United States v. Connelly*, 117 F.4th 269, 277 (5th Cir. 2024). In other words, marijuana users and possessors are not necessarily dangerous. Typically, the determination of whether an offense is possession or possession with intent simply comes down to the amount of drugs. There is no basis for a conclusion that drug users and possessors are categorically not "intrinsically dangerous" but drug

possessors with intent categorically are "intrinsically dangerous." The cases involving drug *users* often involve weapons. Users of illicit drugs are criminals who often associate with other criminals, like the drug traffickers they keep in business, and they often do things that criminals do that cause danger – just like Justice Kennedy discussed in *Harmelin* as referenced above. They also have just as much reason, if not more, to protect their stash as a drug trafficker.

Further, there occasionally are cases involving people who were convicted of possession with intent offenses that did not involve a weapon or any violence. An example might be a situation where a young person, who has never been violent and was not armed, accepted a job to drive a car from one location to another without knowing it contained a hidden compartment full of drugs. That young person could then be disarmed for life without any chance of ever proving he was not a danger. Yet, a habitual drug user who continues to keep the drug traffickers in business would not be disarmed for life. There is no basis for such a disparity. For these reasons, I disagree with the majority's rejection of an individual assessment of dangerousness. Thus, I respectfully concur in part and in the judgment.