# United States Court of Appeals for the Fifth Circuit

---

No. 24-60401

---

United States Court of Appeals
Fifth Circuit

**FILED**

December 17, 2025

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

EDWARD COCKERHAM,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 5:21-CR-6-1

---

Before HIGGINSON, HO, and WILSON, *Circuit Judges*.

JAMES C. HO, *Circuit Judge*:

The right to keep and bear arms under the Second Amendment is a fundamental civil right, comparable to other provisions of the Bill of Rights. *See, e.g.*, *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950) (describing the First, Second, Fourth, Fifth, and Sixth Amendments as the "civil-rights Amendments"); *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49–50 n.10 (1961) (comparing "the commands of the First Amendment" to "the equally unqualified command of the Second Amendment"). Of course, "[l]ike most rights, . . . the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). But courts may not treat the Second

No. 24-60401

Amendment as "a second-class right." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 70 (2022) (quotations omitted).

Our analysis of the Second Amendment must be guided by history—not hoplophobia. "[W]hen a firearm regulation is challenged under the Second Amendment, the Government must show that the restriction is consistent with the Nation's historical tradition of firearm regulation." *United States v. Rahimi*, 602 U.S. 680, 689 (2024) (quotations omitted).

Historical tradition unquestionably permits the Government to disarm violent criminals. *See*, *e.g.*, *United States v. Bollock*, 123 F.4th 183, 185 (5th Cir. 2024) ("The historical record demonstrates 'that legislatures have the power to prohibit dangerous people from possessing guns.' . . . [F]ounding era law . . . supports a tradition of disarming individuals . . . whose underlying convictions stemmed from the threat and commission of violence.") (quoting *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting)).

But our history is very different when it comes to non-violent crimes. "History does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons." *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting). *See*, *e.g.*, *United States v. Mitchell*, _ F.4th _, _ (5th Cir. 2025) (holding that "this Nation's historical tradition" does not empower the Government to categorically disarm all individuals convicted of "a non-violent offense"); *United States v. Doucet*, 2025 WL 3515404, *4 (5th Cir.) (same).

And that's the issue with the law we examine today. Under 18 U.S.C. § 922(g)(1), it's unlawful for any person to possess a firearm who has been convicted in any court of any crime, so long as the crime is "punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1).

2

So § 922(g)(1) is not limited to violent felonies. It's not even limited to felonies. *See* 18 U.S.C. § 921(a)(20). Moreover, it disarms individuals who have never been incarcerated. What's more, it disarms them for the rest of their lives. So it imposes a lifetime ban on possession of a firearm—and it does so even if the person has never spent a single day in prison.

This overreach is compounded by overcriminalization. "[C]riminal laws have grown so exuberantly and come to cover so much previously innocent conduct that almost anyone can be arrested for something." *Nieves v. Bartlett*, 587 U.S. 391, 412 (2019) (Gorsuch, J., concurring in part and dissenting in part). *See also* Brief for American Civil Liberties Union, et al. as Amici Curiae Supporting Defendant-Appellant, *United States v. Duarte*, 137 F.4th 743 (9th Cir. 2025), 2024 WL 6465955, *9. Section 922(g)(1) "would even apply to someone who possessed a firearm solely to *prevent* danger or violence." *Id.* at *12. Imagine, for example, "a schoolboy came home with a loaded gun and his ex-felon father took it from him, put it in drawer, and called the police." *Id.* (quoting *United States v. Teemer*, 394 F.3d 59, 64 (1st Cir. 2005)).

So it's not surprising that judges, scholars, and civil rights experts have condemned § 922(g)(1) as "wildly overinclusive." Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 721 (2007). *See also*, *e.g.*, *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) (per curiam) (same); *Kanter*, 919 F.3d at 466 (Barrett, J., dissenting) (same); ACLU Amici Br., 2024 WL 6465955, at *7.

The Supreme Court has indicated that laws like § 922(g)(1) are only "presumptively lawful." *Rahimi*, 602 U.S. at 699 (quoting *Heller*, 554 U.S. at 626–27 & n.26). It could have adopted a "categorical rule" of validity— the preceding sentence in *Rahimi* certainly suggests that it's well familiar with the concept. But it didn't. As Justice O'Connor and others have noted,

"*Heller* referred to felon disarmament bans only as 'presumptively lawful.'" *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010). And that, "by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge." *Id.*

We agree with Justice O'Connor's reading of *Heller*. In *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), we said that "[s]imply classifying a crime as a felony does not meet the level of historical rigor required by *Bruen* and its progeny." *Id.* at 469. Instead, we must determine whether disarming a particular defendant for life is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 467 (quotations omitted).

Applying the historical analysis required by governing precedent, we cannot affirm the lifetime disarmament of Edward Cockerham. His sole predicate offense under § 922(g)(1) is his failure to pay child support—an offense for which he was not sentenced to a single day in prison.

The Government attempts to justify Cockerham's § 922(g)(1) conviction by analogizing failure to pay child support to theft, and comparing the incarceration of thieves with the Founding era practice of debtors' prisons. But during the Founding era, debtors were released from debtors' prison upon payment of their debts. Thieves, by contrast, remained incarcerated even if the stolen property had been returned or recovered.

So at the Founding, debtors were treated differently from thieves. Thieves could be permanently disarmed—but debtors, only temporarily, until discharge of their debt. The Government itself admitted as much during oral argument. And its admission dooms its analogy. Because at the time that Cockerham was found in possession of a firearm, he was no longer delinquent of any failure to pay child support. So there was no historical justification to disarm him at that moment—never mind for the rest of his life.

No. 24-60401

Cockerham's § 922(g)(1) conviction therefore violates the Second Amendment. We accordingly reverse and remand for further proceedings consistent with this opinion.

## I.

Cockerham pled guilty for failing to pay child support, in violation of Mississippi law. *See* MISS. CODE § 97-5-3. He was sentenced to five years of probation. But Mississippi law makes clear that he could have been imprisoned for up to five years. *Id.* He eventually repaid his child support and was released from probation.

Cockerham was subsequently indicted for possessing a firearm, in violation of § 922(g)(1), based solely on his prior conviction for failing to pay child support. He twice moved to dismiss the indictment, arguing that § 922(g)(1) violates the Second Amendment as applied to him, as well as on its face. The district court denied both motions. Cockerham then pled guilty pursuant to a plea agreement that preserved his right to appeal his Second Amendment claims.

This timely appeal followed. Cockerham argues that his conviction under § 922(g)(1) violates the Second Amendment as applied to him, as well as on its face. He also argues that § 922(g)(1) violates the Commerce Clause and the Equal Protection Clause, and that it is void for vagueness.

Except for the as-applied Second Amendment challenge, all of his arguments are foreclosed by precedent. *See, e.g.*, *Diaz*, 116 F.4th at 471 (holding that § 922(g)(1) does not facially violate the Second Amendment); *United States v. Alcantar*, 733 F.3d 143, 145–46 (5th Cir. 2013) (holding that § 922(g)(1) does not violate the Commerce Clause); *United States v. Branson*, 139 F.4th 475, 477–79 (5th Cir. 2025) (holding that § 922(g)(1) does not violate the Equal Protection Clause and is not void for vagueness).

No. 24-60401

## II.

In *Bruen*, the Supreme Court set forth a two-step framework for analyzing challenges under the Second Amendment. First, we determine whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 17. If so, "the Constitution presumptively protects that conduct." *Id.* "At the first step, the government may justify its regulation by establishing that the challenged law regulates activity falling outside the scope of the right as originally understood." *Id.* at 18 (cleaned up).

But if the challenged regulation implicates a right protected under the Second Amendment—as § 922(g)(1) plainly does—then "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17.

"[T]his historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.* at 28. And "[l]ike all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 28–29.

To determine whether or not a particular regulation is indeed "relevantly similar" under the Second Amendment, we look to "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Id.* (quotations omitted).

"[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 30. "[C]ourts should not uphold every modern law that remotely resembles a historical

6

analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id.* (cleaned up). "On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

In *Diaz*, we applied *Bruen* to an as-applied challenge to § 922(g)(1). We began by rejecting the Government's threshold argument that felons are "not among 'the people' protected by the Second Amendment." 116 F.4th at 466. We then applied the first step of the *Bruen* framework and held that "[t]he plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)." *Id.* at 467. So we turned to the second step of *Bruen* and determined whether there is a "relevantly similar" "historical *analogue*" sufficient to justify applying § 922(g)(1) to the defendant there. *Id.*

We observed that "the crime of theft . . . was considered a felony at the time of the Founding and was punished accordingly." *Id.* at 468. We surveyed various colonial era laws and concluded that "our country has a historical tradition of severely punishing people . . . convicted of theft." *Id.* at 468–69.

What's more, we specifically pointed out that "[t]hese laws achieved their goals by *permanently* punishing offenders." *Id.* at 469 (emphasis added). "Capital punishment is obviously permanent, and the majority of the estate forfeiture laws that the government cites did not provide an opportunity for offenders to regain their possessions." *Id.*

We concluded that "[p]ermanent disarmament under § 922(g)(1) does not punish such crimes to an extent beyond what was done at the founding, given the government's evidence that crimes such as theft were punished so severely and permanently." *Id.* (cleaned up).

The Government attempts to justify the use of § 922(g)(1) here by invoking *Diaz* and analogizing Cockerham's failure to pay child support to the crime of theft. The Government also points out that, during the Founding era, people who failed to pay their debts could be subject to debtors' prison.

But the Government's invocation of debtors' prison only serves to demonstrate that the crime of theft is not analogous to failure to pay one's debts. As the Government admitted during oral argument, debtors were released from prison once their debts were paid. *See* Oral Arg. at 18:20–18:45. *See also*, *e.g.*, Nino C. Monea, *A Constitutional History of Debtors' Prisons*, 14 Drexel L. Rev. 1, 7 (2022) ("These incarcerated debtors could be held until they repaid or the creditor decided to let them go."); *Body Attachment and Body Execution: Forgotten But Not Gone*, 17 Wm. & Mary L. Rev. 543, 547 (1976) ("[T]he debtor was held in close imprisonment until he paid the debt or until the creditor permitted release."); Olivia C. Jerjian, *The Debtors' Prison Scheme: Yet Another Bar in the Birdcage of Mass Incarceration of Communities of Color*, 41 N.Y.U. Rev. L. & Soc. Change 235, 242–43 (2017) (noting Massachusetts and Pennsylvania laws that kept a debtor imprisoned until the debt was repaid or the creditor permitted release); Marcus Cole, *A Modest Proposal for Bankruptcy Reform*, 5 Green Bag 2d 269, 271–72 (2002) (explaining early debtors' prison statutes that required imprisonment until the debtor "made agreement (to satisfy the debt) or his friends for him," which remained "unchanged until its abolition in the nineteenth century").

By contrast, the Government does not dispute that thieves were not released even if stolen goods were voluntarily returned. *See also*, *e.g.*, Wayne R. LaFave, 3 Subst. Crim. L. § 19.5(b) (3rd ed.) (2025) ("[O]ne who takes another's property intending at the time of taking to deprive the owner permanently is nevertheless guilty of larceny, though he later (becoming

8

No. 24-60401

frightened, or his better nature prevailing) decides to return it and does so.").[1]

These admissions are fatal to Cockerham's § 922(g)(1) conviction. As the record demonstrates, and as the Government conceded during oral argument, Cockerham was no longer delinquent and had fully paid the child support debt for which he was convicted at the time he was found in possession of a firearm. *See* Oral Arg. at 32:55–33:10. So there's no historical justification to disarm him at that moment—never mind for the rest of his life. The Government counters by suggesting that Cockerham may have incurred new child support debt by the time he was found in possession of a firearm. But as the Government acknowledged, § 922(g)(1) turns on convictions, not allegations. *See* Oral Arg. at 33:10–34:35. *See also*, *e.g.*, *United States v. Kimble*, 142 F.4th 308, 318 (5th Cir. 2025) (rejecting reliance on "unproven conduct").[2]

---------------------------------------

[1] The Government attempts to bolster its theft analogy by invoking the United States Sentencing Guidelines, which treats theft as the "most analogous guideline" to failure to pay child support. But as explained above, *Bruen* requires us to consider historical practice, not modern views on disarmament. So the Government's argument proves too much: If modern views are sufficient to survive Second Amendment scrutiny, then *every* conviction under § 922(g)(1) would be automatically valid—after all, surely the enactment of § 922(g)(1) by our elected representatives in Congress reflects modern views on disarmament even better than the members of the United States Sentencing Commission.

[2] In its briefing on appeal, the Government argued that "Cockerham's status [as] a defendant under probationary supervision provides an additional reason why he could be barred from possessing a gun." *See*, *e.g.*, *United States v. Giglio*, 126 F.4th 1039, 1043–44 (5th Cir. 2025) (upholding use of § 922(g)(1) because "the historical practice of disarming a convict during his sentence justified the modern practice of disarming individuals serving their sentences on supervised release") (cleaned up). But the record proves otherwise—as the Government later conceded during oral argument. *See* Oral Arg. at 32:35–32:55.

## III.

Although the Government understandably does not contend that failure to pay child support is a violent crime, we note that other aspects of Cockerham's background suggest that he may indeed be violent. Cockerham has been arrested for aggravated assault and domestic violence, for example. He has also been charged with trafficking in controlled substances and stalking.

But the Government does not rely on any of this background to affirm Cockerham's § 922(g)(1) conviction. To the contrary, the Government conceded during oral argument that those are unproven allegations, and that it does not ask us to affirm Cockerham's § 922(g)(1) conviction based on unproven allegations. *See* Oral Arg. 27:10–29:15.

And for good reason. In other circuits, it's been suggested that courts might not limit themselves to the predicate offense when determining the validity of a § 922(g)(1) conviction. *See*, *e.g.*, *United States v. Williams*, 113 F.4th 637, 659–60 (6th Cir. 2024) ("When evaluating a defendant's dangerousness, a court may consider a defendant's entire criminal record—not just the specific felony underlying his § 922(g)(1) conviction.").

But our circuit has not taken that approach. "[O]ur circuit's binding precedent espouses evaluating as-applied challenges to § 922(g)(1) by focusing on the nature of the predicate offense rather than on the defendant's broader criminal history or individual characteristics." *United States v. Hernandez*, 159 F.4th 425, 428 (5th Cir. 2025). "[W]e sift the elements of a defendant's prior convictions through *Bruen*'s analogical framework, and not the defendant himself." *Id.* "We . . . do not embrace the view that courts should look beyond a defendant's predicate conviction and assess whether the felon's history or characteristics make him likely to misuse firearms." *Kimble*, 142 F.4th at 318 (quotations omitted). "The relevant consideration

is a defendant's prior convictions that are punishable by imprisonment for a term exceeding one year, not unproven conduct." *Id.* (quotations omitted).

## IV.

Some thoughts about the dissent before we close.

## A.

We begin with a few areas of consensus.

First, our distinguished dissenting colleague concedes that it is "defensible" and "plausible" to treat Cockerham as a "colonial-era *debtor*," rather than a "colonial-era *thief*." *Post*, at 26 (Higginson, J., dissenting).

And for good reason: Cockerham is a debtor, not a thief.

Second, our colleague says that he would do "no more than remand" to give the Government a second chance to compile "some fractional amount of history" before we hold § 922(g)(1) unconstitutional as applied to Cockerham. *Post*, at 21, 27.

So at a minimum, our decision today is unanimous against affirmance.

But our agreement may be even more robust than that. Our colleague may *say* that he would do "no more than remand." *Id.* at 1. But his opinion seems to acknowledge that, even under his approach, we should be ordering vacatur—if not reversal.

In support of his plea for remand only, our colleague cites his previous opinion for the court in *United States v. Smith*, 2025 WL 2938691 (5th Cir.). *See post*, at 21, 24, 28 (citing *Smith*).

*Smith* did exactly what he urges here—it lets the district court "resolve the history and tradition related to [the defendant's] predicate felonies in the first instance." 2025 WL 2938691, at *1.

But as our colleague explained in *Smith*, that requires vacatur. In *Smith*, the court ordered "vacat[ur]" of "the district court's order denying [the defendant's] motion to dismiss his indictment." *Id.* at *1. It then remanded "for the district court to reconsider [the defendant's] as-applied Second Amendment challenge." *Id.*

Moreover, our dissenting colleague bolsters his reliance on *Smith* by additionally citing our precedential decision in *United States v. Daniels*, 124 F.4th 967 (5th Cir. 2025), which he joined. *See post*, at 24 n.3.

In *Daniels*, the court reversed the conviction altogether. *See* 124 F.4th at 979; *id.* at 980 (Higginson, J., concurring) ("I concur that Daniels's judgment of conviction must be reversed."); *post*, at 24 n.3 (noting that he concurred in the reversal).

*Daniels* also remanded and explicitly left open the possibility that the Government might someday resuscitate the reversed conviction by presenting stronger historical evidence in a future proceeding. *See* 124 F.4th at 977 ("The government has not pointed to sufficiently analogous historical laws . . . . The government remains free to reprosecute . . . under a theory consistent with a proper understanding of the Second Amendment."); *post*, at 24 n.3 (Higginson, J., dissenting) (noting that he concurred in *Daniels* because the court reversed the conviction and remanded "to ensure the [] conviction meets the requirement under intervening caselaw that it be 'historically rooted'").

Our decision today is of course bound by our precedent in *Daniels*. Accordingly, if the Government can compile stronger historical evidence to support this conviction than it has done so far, it may do so in a future proceeding, just as in *Daniels*.

So our colleague's decision may be formally labeled a dissent. But because the dissent invokes *Daniels*, we might be inclined to characterize his

views as a concurrence (or concurrence in the judgment) instead—as he did in *Daniels*.   We understand that the dissent would rather give the Government a second bite at the apple *before* reversing this conviction as unconstitutional.  But in *Daniels*, he was willing to give the Government that second bite only *after* reversing the conviction as unconstitutional.

## B.

All that being said, our dissenting colleague is unwilling to follow either the course he set in *Daniels* (reverse the conviction but let the Government try again on remand), or the one he set in *Smith* (vacate the denial of the motion to dismiss and remand to give the district court first crack at the historical analysis).   Instead, he would do "no more than remand." *Post*, at 21.

We can and do respect our difference of opinion, while observing that our colleague's approach conflicts with precedent and party presentation.

As already noted, it conflicts with *Daniels*.  It also conflicts with our other decisions that likewise decline to give the Government another chance on remand before holding § 922(g)(1) unconstitutional as applied.  *See*, *e.g.*, *Mitchell*, _ F.4th _; *see also Doucet*, 2025 WL 3515404.

What's more, during oral argument, our colleague offered the Government a second bite at the apple on remand.   The Government emphatically declined.  *See* Oral Arg. at 29:50–30:05 (Q: "[A]t worst, should we send it back down . . . is that the Government's position?"  A: "No, no, no, Your Honor."   Q: "You want us to decide on the history now."   A: "That's right."   Q: "Here at the appellate level."   A: "That's right.").

Our colleague has eloquently observed that "our adversarial system of adjudication is designed around the premise that parties represented by competent counsel know what is best for them."  *United Natural Foods, Inc.*

*v. NLRB*, 66 F.4th 536 (5th Cir. 2023) (cleaned up), *vacated on other grounds*, 144 S. Ct. 2708 (2024). So "it would be improper for us to cross the bench to counsel's table and litigate the case for it." *Id.*

Nor is "remand only" the dissent's only party presentation problem. The dissent also invites us to ignore—and instead relitigate—the Government's concessions concerning Cockerham's repayment of child support and release from probation. *See post*, at 21 n.2.

In addition, our colleague spills considerable ink going beyond the elements of the predicate offense, and examining the defendant himself. But that too contradicts party presentation as well as precedent. As for party presentation, see Oral Arg. 27:10–29:15, as noted above. As for precedent, our colleague has repeatedly acknowledged that circuit precedent compels us to "sift the elements of a defendant's prior convictions through *Bruen*'s analogical framework, *and not the defendant himself*." *Hernandez*, 159 F.4th at 428 (emphasis added). *See also*, *e.g.*, *Smith*, 2025 WL 2938691, at *2 n.3 ("[L]ooking beyond predicate felony convictions is *not appropriate* in a § 922(g)(1) constitutional analysis.") (emphasis added); *United States v. Locket*, 2025 WL 2945534, *1 (5th Cir.) ("[C]ourts should not 'look beyond' a defendant's predicate conviction and assess whether the felon's history or characteristics make him likely to misuse firearms.") (cleaned up).

Finally, the dissent discusses colonial America and its abhorrent treatment of women and children as chattel property, rather than as human beings entitled to legal protection against crime—and warns us that "the Supreme Court corrected us" on this point in *Rahimi*. *Post*, at 29–30. But it should be obvious that our analysis today applies to the failure to pay *any* debt, regardless of whether the victim is an adult or child—just as our analysis in *Rahimi* applied to *any* suspicion of violence, regardless of whether the stated victim is a man or a woman. Certainly the Supreme Court did not

share the dissent's historical concerns. Nothing in its decision in *Rahimi* turned on (or even mentioned) women being treated as chattel (and the dissent does not claim otherwise). To the contrary, *Rahimi* affirmatively notes that the history and common law of surety protected both husbands and wives, dating back to the days of Blackstone. *See* 602 U.S. at 695–96.

* * *

We recognize that a number of our sister circuits have affirmed § 922(g)(1) as a categorical matter. *See*, *e.g.*, *Zherka v. Bondi*, 140 F.4th 68, 93 (2nd Cir. 2025); *United States v. Hunt*, 123 F.4th 697, 702–04 (4th Cir. 2024); *United States v. Jackson*, 110 F.4th 1120, 1125 (8th Cir. 2024); *United States v. Duarte*, 137 F.4th 743, 750–52, 761–62 (9th Cir. 2025) (en banc); *Vincent v. Bondi*, 127 F.4th 1263, 1265–66 (10th Cir. 2025); *United States v. Dubois*, 94 F.4th 1284, 1292 (11th Cir. 2023).

But that is not how Justice O'Connor and others have construed governing Supreme Court precedent. *See*, *e.g.*, *Williams*, 616 F.3d at 692; *Range v. Attorney Gen. United States*, 124 F.4th 218, 230–32 (3rd Cir. 2024) (en banc); *Williams*, 113 F.4th at 657–60. Nor is it how we have read Supreme Court precedent.

Historical analysis determines whether a particular individual can be disarmed for life under § 922(g)(1). And we are unable to find a historical basis for disarming Cockerham for the rest of his life, just because he was once convicted of failure to pay child support.

The Government analogizes failure to pay child support to theft. But during the Founding era, thieves were treated differently from debtors. Thieves were subject to permanent disarmament. Debtors were not. Debtors could be imprisoned, and thus temporarily disarmed. But they were released from debtors' prison upon payment of their debt. And the

15

No. 24-60401

Government acknowledges that Cockerham was no longer delinquent of any failure to pay child support when he was found in possession of a firearm.

Cockerham's conviction under § 922(g)(1) violates the Second Amendment. We accordingly reverse and remand for further proceedings consistent with this opinion.

JAMES C. HO, *Circuit Judge*, concurring:

The dissent contends that "the Supreme Court corrected us" in *United States v. Rahimi*, 602 U.S. 680 (2024), *rev'g* 61 F.4th 443 (5th Cir. 2023). *Post*, at 29. I write in response to defend our court's earlier decision in *Rahimi* as a faithful application of *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

## I.

Only the Supreme Court can adjust or amend its own precedents. Inferior courts have no such luxury.

Indeed, the Supreme Court has explicitly instructed us to follow its precedents even when we don't expect the Court itself to do so. *See, e.g.*, *Rodriguez de Quijas v. Shearson/Am. Exp.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (same); *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("The Court of Appeals was correct in applying that principle despite disagreement . . . , for it is this Court's prerogative alone to overrule one of its precedents."); *United States v. Hatter*, 532 U.S. 557, 567 (2001) (same).

So only the Supreme Court can modify or overrule its own precedents—and then reverse us when it does so. *See, e.g.*, *Jackson Women's Health Org. v. Dobbs*, 597 U.S. 215 (2022), *rev'g* 945 F.3d 265 (5th Cir. 2019).

## II.

Accordingly, it would have been insubordinate of us—and defiant of the Court's express instructions in *Rodriguez de Quijas*, *Agostini*, *State Oil*,

and *Hatter*—had we decided *Rahimi* based on anticipated changes to *Bruen*, rather than on *Bruen* itself.

So we didn't. We faithfully applied *Bruen* in *Rahimi*. And not a single member of our court disagreed with our interpretation or application of *Bruen* at the time. As one of our distinguished colleagues put it then, our job is not to relitigate or reconsider *Bruen*, but to "operat[e] in good faith" and "faithfully implement *Bruen*." *United States v. Daniels*, 77 F.4th 337, 357–58 (5th Cir. 2023) (Higginson, J., concurring).

Notably, a respected former federal judge on another circuit made an unusual public statement that our decision in *Rahimi* "took *Bruen* seriously and applied it to a logical end." Rachel Weiner, *The Supreme Court upended gun laws nationwide. Mass confusion has followed.*, WASH. POST, July 7, 2024 (quoting Judge Paul Watford).

Similar comments can be found throughout the academy and legal commentariat as well. For just a few examples, see Mary Anne Franks, US v. Rahimi, *Originalism's Loaded Weapon, and the Lost Boys of the Supreme Court*, 22 OHIO ST. J. OF CRIM. L. 187, 192 (2025) ("the Fifth Circuit's opinion . . . faithfully followed *Bruen*") (quotations omitted); Nelson Lund, *The Fidelity of 'Originalist' Justices Is About to Be Tested*, N.Y. TIMES, Apr. 9, 2024 ("Under Bruen's originalist test, Rahimi should be an easy case."); Noah Feldman, *Gun Case Forces Supreme Court to Confront Its Own Illogic*, BLOOMBERG LAW, Nov. 8, 2023 ("The Rahimi case shows what happens when the justices" adopt the "historical tradition test . . . in Bruen."); Daniel S. Harawa, *Between a Rock and a Gun*, 134 YALE L. J. FORUM 100, 103 (2024) ("If the Court had been intellectually honest and had faithfully followed *Bruen*, Mr. Rahimi's position as a criminal defendant would have carried the day."); Jeff Welty, *Backing Away from Bruen? Supreme Court Upholds Law Barring Restraining Order Subjects from Possessing Guns*, N.C.

CRIM. LAW BLOG, July 1, 2024 ("Although the majority opinion in *Rahimi* is couched as a faithful application of *Bruen*, it is not hard to argue that *Rahimi* backs away from the bold strokes of *Bruen*."); Marcia Coyle, *Analysis: How a Supreme Court ruling led to the overturning of a guns and domestic violence law*, PBS NEWS, Feb. 8, 2023 ("[T]he *Bruen* test is the law of the land, and the Fifth Circuit panel in *Rahimi* was bound to follow it."); Conner Greene, *The Second Amendment's Domestic Violence Problem: How Rahimi Exposes the Flaws of Bruen's Problematic Historical Analogue Test*, 72 CLEV. ST. L. REV. 937, 941 (2024) ("Because the Supreme Court backed itself into such a difficult corner with the *Bruen* test, it is likely going to need to use a selective cherry-picking of history to uphold gun regulations protecting domestic violence victims in *Rahimi*, backtrack on the test it created just two years ago, or hold 18 U.S.C. § 922(g)(8) unconstitutional."); Sabrina Talukder, *The Supreme Court Case* United States v. Rahimi *Underscores the Ugly Truth About Originalism and Women*, CENTER FOR AM. PROGRESS, Oct. 17, 2023 ("*Rahimi* underscores the direct and confusing impact of [*Bruen*]"); Ian Millhiser, *The Supreme Court refuses to accept blame for its worst guns decision*, VOX, June 21, 2024 ("[The Fifth Circuit's] decision in the *Rahimi* case was correctly decided under *Bruen*.").

## III.

The Supreme Court reversed our court in *Rahimi*. In order to do so, it had to reverse what it said in *Bruen*.

*Bruen* held that surety laws do not provide historical support for banning gun possession. After all, surety laws merely require individuals to "post bond before carrying weapons in public." 597 U.S. at 55. So they're merely "financial incentives." *Id.* at 59. They're "not *bans* on public carry." *Id.* at 55. *See also id.* at 59 (same). So any "reliance on them is misplaced." *Id.* at 55.

In sum, surety laws are irrelevant to gun bans, under *Bruen*.

The Court reversed those views in *Rahimi*. Far from being irrelevant, surety laws now "confirm" that covered individuals "may be disarmed." *Rahimi*, 602 U.S. at 698. *See id.* at 698–70 (relying on surety laws as historical support for 18 U.S.C. § 922(g)(8)); *see also id.* at 751, 752–53, 762–64, 766–68 (Thomas, J., dissenting) (noting the Court's reversal of position on surety laws); *United States v. Rahimi*, 117 F.4th 331, 333 n.1 (5th Cir. 2024) (same); *id.* at 334–36 (Ho, J., concurring) (noting other modifications made by the Supreme Court in *Rahimi*).

\* \* \*

So the Court didn't "correct" us in *Rahimi*, any more than it "corrected" us in *Dobbs*. In both *Dobbs* and *Rahimi*, the Court reversed us—but it "corrected" *itself*.

That's how vertical *stare decisis* works. I accordingly concur in our court's faithful application of governing precedent in this case, just as I did in *Rahimi*.

No. 24-60401

Stephen A. Higginson, *Circuit Judge*, dissenting:

In recognizing that "the law regarding the interplay between the Second Amendment and § 922(g)(1) is rapidly evolving," I respectfully dissent from the majority's decision to resolve this case in the present underdeveloped posture. *See United States v. Smith*, No. 24-60600, 2025 WL 2938691, at *2 (5th Cir. Oct. 16, 2025) (unpublished). Given our court's binding precedent in *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), which conflicts with every other court of appeals[1]; given the absence of robust compilation, much less resolution, of a historical record for us to apply our *Diaz* test; and given factual inconsistencies between our court's decision and the record on appeal[2]—given all three, I would do no more than remand to permit the parties, and the district court, to address these points in the first instance.

It is the responsibility and prerogative of the parties to present, and the district court to make the necessary historical and evidentiary findings, as to whether there is Founding-era practice analogous to support felony prosecution of individuals like Cockerham, who has a prior felony conviction

_____

[1] More exactly, the majority acknowledges that its invalidation of Cockerham's § 922(g)(1) conviction conflicts with six circuits, which defer to the constitutionality of the statute as applied to all felons; the majority also notes that it conflicts separately with two other circuits that assess as-applied challenges with reference to individual defendant dangerousness. *See United States v. Mancilla*, 155 F.4th 449, 454 n.5 (5th Cir. 2025) (Elrod, C.J., concurring); *cf. United States v. Orozco*, No. 24-50104, 2025 WL 2623429, at *2 (5th Cir. Sept. 11, 2025) (Higginson, J., concurring) (discussing recent Fifth Circuit efforts to apply Second Amendment precedent to § 922(g)(1) cases).

[2] The majority resolves this case factually with repeated reference to government concessions and, in particular, that Cockerham "repaid his child support and [also] was released from probation." Op. at 5, 9–10. At minimum, the district court should resolve determinative factual circumstances in the first instance, above all when fact conclusions we rely on are contradicted by Cockerham's sworn factual basis and his Presentence Report accepted by the district court whose judgment of conviction we are reviewing.

No. 24-60401

for failure to pay child support. This predicate felony presents a matter of first impression and is therefore deserving of more considerate explication in the district court.

I.

Factually, Cockerham's offense conduct was as follows:

12. Approximately four minutes after arriving at the motel, Cockerham's vehicle left the parking lot. MBN agents followed and conducted a traffic stop, based on the lack of license plate, near Edgar Street at the intersection of 22nd Street in McComb. Agents made contact with Cockerham and inquired as to the lack of license plate and if there was anything illegal in the vehicle. Cockerham denied there was anything illegal in the car, but stated there was a gun under the driver's seat. Agents asked if Cockerham was on probation, and he indicated he was on probation for child support. Due to Cockerham's admission to being on felony probation, agents knew he was a convicted felon, and he was removed from the vehicle. Cockerham was taken to the rear of the car and asked to empty his pockets. Cockerham pulled $2,016 in U.S. currency from his pockets.

13. Agents located a Kel-Tec, Model PMR-30, .22 caliber, semi-automatic handgun bearing serial number WWZZ37, under the driver's seat of Cockerham's vehicle. The firearm was loaded with almost 30 rounds of ammunition and a round in the chamber. In addition, a Polymer 80, Model PF940V2, 9mm semi-automatic handgun, bearing no manufactured serial number, was found in the glove compartment of the vehicle. It was noted the firearm was loaded with 15 rounds of ammunition and one round in the chamber.

14. Agents advised Cockerham of his rights and had him sign a waiver of the rights. Cockerham was asked if he was employed, and he indicated he was not. While placing Cockerham in custody, he jerked away from agents and fled on foot. While in pursuit, agents observed Cockerham reach into his pants while

22

fleeing. Cockerham ran in a straight path until he ran between two cars to the left. After the detour, Cockerham fell to the ground and complied while being taken into custody. He was transported to the McComb City Jail.

15. Agents walked to the place where Cockerham ran between the two vehicles and located a plastic bag on the ground. The bag contained approximately 14 grams of methamphetamine, approximately 1.5 grams of cocaine, and approximately 12 grams of marijuana. The substances were later submitted to the Mississippi Forensic Laboratory for testing, and the firearms were turned over to the ATF. The defendant was charged with possession with intent to deliver methamphetamine, marijuana, and cocaine (crack) as well as possession of a firearm by a convicted felon.

16. On September 28, 2020, ATF agents examined the Kel-Tec, Model PMR-30, seized from Cockerham and determined it was manufactured in Florida, outside the state of Mississippi. The firearm was re-examined on April 5, 2024, and further determined the handgun to meet the definition of "firearm."

The present appeal comes to us from Cockerham's motion to dismiss, which was predicated *solely* on the Supreme Court's ruling in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). The district court denied Cockerham's motion and, in doing so, cited to our pre-*Diaz*, then-binding, Fifth Circuit law in *United States v. Jones*, where our court held: "Given the absence of binding precedent holding that § 922(g)(1) is unconstitutional, and that it is unclear that *Bruen* dictates such a result, we have rejected plain-error challenges to § 922(g)(1) under *Bruen* . . . ." 88 F.4th 571, 573 (5th Cir. 2023). The district court held that, "[a]bsent a Supreme Court or Fifth Circuit decision ruling otherwise, the Court is persuaded that it remains bound by Fifth Circuit precedent under § 922(g)(1)." While relying on then-binding caselaw, much has changed in the § 922(g)(1) landscape since the district court's ruling nearly two years ago.

## II.

As the Supreme Court observed in *Bruen*, "analogical reasoning" is a "commonplace task for any lawyer or judge." 597 U.S. at 28-29. That encouragement, however, rests alongside the Court's confidence that such reasoned decision-making will be "based on the historical record compiled by the parties." *Id.* at 25 n.6.

No historical record as to Cockerham's predicate felony conviction was tested and resolved by first-instance district-court adjudication and then submitted to us for careful appellate review. *See Smith*, 2025 WL 2938691, at *2 (remanding to the district court to consider intervening § 922(g)(1) precedents and to require the government to meet its *Bruen* burden).[3]

This occurred because neither party, nor the district court, could have anticipated that our court would break with or go farther than precedent—of our own,[4] other circuits[5] and the Supreme Court[6]—and announce in *Diaz* that a new, second level of history now must be compiled, this time an inquiry into whether felons' predicate convictions themselves fall into buckets of crimes that our court continues to expand upon in identifying and delineating

---

[3] *Cf. United States v. Daniels*, 124 F.4th 967, 980 and n.1 (5th Cir. 2025) (HIGGINSON, J., concurring) (concurring in the reversal and remand to ensure the § 922(g)(3) conviction meets the requirement under intervening caselaw that it be "historically rooted").

[4] *See Diaz*, 116 F.4th at 464–65 (overruling Fifth Circuit precedent for the reason that the government must identify a relevant, similar historical tradition of firearm regulation).

[5] *E.g.*, *United States v. Jackson*, 110 F.4th 1120, 1125 (8th Cir. 2024) ("Given [] assurances by the Supreme Court, and the history that supports them, we conclude that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1).").

[6] *See Diaz*, 116 F.4th at 466 (rejecting as dicta and ahistorical repeated Supreme Court cautions that "felons and the mentally ill" may be permanently disarmed).

persons subject to § 922(g)(1) prosecution. *See United States v. Hernandez*, No. 24-50589, 2025 WL 3236975, at *3 (5th Cir. Nov. 20, 2025) ("To date, this court has recognized 'three categories of offenses that doom a defendant's as-applied challenge…theft, violence, and violating the terms of one's release by possessing arms while on parole.'" (quoting *United States v. Kimble*, 142 F.4th 308, 311–12 (5th Cir. 2025))); *United States v. Orozco*, No. 24-50104, 2025 WL 2623429, at *2 (5th Cir. Sept. 11, 2025) (confirming inclusion of "another category of predicate felony conviction . . . : 'convictions for drug trafficking'" (quoting *Kimble*, 142 F.4th at 318)); *see also United States v. Mitchell*, No. 24-60607, 2025 WL 3251467, at *18 (5th Cir. Nov. 21, 2025) (holding that predicate felonies that involved "present" intoxication with marijuana do not qualify, but those that involved "habitual" intoxication do); *United States v. Doucet*, No. 24-30656, 2025 WL 3515404, *6 (5th Cir. Dec. 8, 2025) (unpublished) (holding that the predicate felony of attempted marijuana cultivation does not qualify); *United States v. Kendall*, No. 24-40441, 2025 WL 1983938, at *2 (5th Cir. July 17, 2025) (holding that "injury to the elderly" qualifies as a predicate, but leaving it unclear as to whether a separate, prior conviction for "unlawful possession of a firearm" would qualify as a valid predicate).

*Diaz* became our binding law *after* the parties litigated Cockerham's *Bruen*-based dismissal motion in district court. The parties did discuss history in the district court, albeit not in the depth nor manner now required by our court. The government recognized the command from *Bruen* as calling for historical analogues, but only explored history as it relates to "(1) historical laws which categorically disqualify groups from possessing firearms based on a judgment that the group could not be trusted to follow the law; and (2) laws authorizing capital punishment and estate forfeiture for certain violent and nonviolent felonies the legislature deemed serious." As Cockerham argued in reply, the government fell short of its burden to

produce historical evidence supporting the permanent disarmament of similarly situated persons. The district court, in turn, necessarily applied *Jones*, then-binding Fifth Circuit precedent, consistent with *Heller*.

On appeal, Cockerham is candid that "child support as we know it is an entirely modern invention," because "[d]uring the Founding-era . . . [c]hildren were regarded 'as a property right, to be treated as chattel.'" For that reason, albeit only in post-*Diaz* letters pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure, Cockerham asks us to compare him to a colonial-era *debtor*, which is plausible. The government, on the other hand, contends Cockerham, as a child-support delinquent whose willful nonpayment of past due child support was egregious enough for Mississippi to charge as a felony offense, resembles a colonial-era *thief*, which is plausible too.[7] The majority aligns itself with Cockerham's analogy to debtors in the Founding era. This may ultimately be a defensible choice about a predicate such as Cockerham's, but it is one we are not yet in a position to render.

Right or wrong, both retrospectives seek to accommodate our unique *Diaz* rule, and are plausible proffers given to us for the first time, minimally, on appeal. But history cannot be an advocate's pick, nor ours. The near-unanimous Supreme Court ruling in *Rahimi* articulated this as well, admonishing courts of appeals neither to impose "law trapped in amber," nor to "'require a 'historical twin' rather than a 'historical analogue.'''" *Rahimi*, 602 U.S. at 691, 701 (quoting *Bruen*, 597 U.S. at 30).

---

[7] *Cf. Bryant v. State*, 567 So.2d 234, 236 (Miss. 1990) (rejecting defendants' arguments that Mississippi's material support criminal statute unconstitutionally provides for imprisonment for debt for nonpayment of support, stating '[t]his State has a legitimate interest in criminally prosecuting financially able parents who wilfully [sic] desert or fail to support their children when in destitute or necessitous circumstances.").

No. 24-60401

Therefore, we should remand for several reasons. First, and as a threshold matter, we should remand because our binding law and the evidentiary framework for analyzing § 922(g)(1) challenges have changed. That's good reason by itself to let the parties and district court compile a historical record responsive to our new rule. Per *Diaz*, the historical question for the district court's resolution now is: Are felons who evaded child support more like those at the founding who evaded taxes or debts, or more like those who committed common theft, whom we have held in *Diaz* can be punished by lifetime gun dispossession?

Second, we should remand for some fractional amount of history to be compiled and, more importantly, assessed under this new framework. Compiling historical records requires diligence. *Compare Jackson*, 110 F.4th at 1125-29 (discussing applicable historical analogues for dispossessing felons); *with Mitchell*, 2025 WL 3251467 at *14–18 (same); *and with Kanter v. Barr*, 919 F.3d 437, 466 n.15 (7th Cir. 2019) (BARRETT, J., dissenting) (expounding upon the historical inquiry over ten pages).[8] By contrast, here, the majority is left with the apparent fact that colonial era debtors "were released once their debts were paid," yet thieves were not. Extrapolating

_____

[8] *See also* Morgan Schmidt, Note, *Felons in Possession: Rejecting the Third Circuit and its Application of* Bruen, 69 ST. LOUIS U. L.J. 409 (2025) (discussing the history work the Supreme Court requires and the burden that has shifted from courts to the government). I also do not consider historical legal analysis more difficult than rule-guided inquiry into "foreign law" determinations, already done in both the civil and criminal context. *See* Allison Orr Larsen, *History's Identity Crisis*, 78 SMU L. REV. 293, 318 (2025) (discussing, as a scholar who seeks to assist courts in doing the task required by *Bruen*, whether and how to evaluate "history and tradition" in the Second Amendment context; noting foreign law determination methods; and acknowledging that "[t]he smartest path takes hard work and slow, deliberate thinking"); *see also* Zachary D. Clopton, *Foreign Law on the Ground*, 52 YALE J. OF INT'L LAW 50 (2025) (surveying the history of federal court usage of foreign law and recognizing its relevance for "history and tradition" inquiries in the Second Amendment context).

from that distinction, but engaging with no historical records, and doing no analogical reasoning except to repeat that "thieves were treated differently from debtors," the majority stops at this: "We are unable to find a historical basis for disarming Cockerham for the rest of his life, just because he was once convicted of failure to pay child support."[9] This inability confirms why I would remand.

Third, remand would reinforce our Article III position. Intermediate appellate courts neither decide facts nor create law. Our role is error correction, no more and no less. There would be less Second Amendment disarray if fastidious historical work were done: First, by the prosecution; then tested in adversary presentation, and perhaps assisted by expert historians; and then adjudicated by district courts in the first instance, not us. *See Smith*, 2025 WL 2938691 at *2 ("On remand, the government must meet its burden under *Bruen* to present historical analogues justifying § 922(g)(1)'s constitutionality as applied to [defendant]."). The Supreme Court has prescribed this sequence and given the government, defendants, and district courts meaningful roles when it comes to compiling historical records and applying the Second Amendment. Only in proper sequence, can

---

[9] To be sure, the majority's decision also focuses on the perils of "overreach compounded by overcriminalization" and "hoplophobia." Op. at 2-3. But the first is left to the people and their representatives, which can and do widely distinguish among felons. *Compare* Zach Sherwood, Note, *Time to Reload: The Harms of the Federal Felon-in-Possession Ban in a Post-*Heller *World*, 70 Duke L.J. 1429, 1468 n.260 (2021) (discussing various state approaches to gun regulations of those with felony convictions), *with Hatfield v. Barr*, 925 F.3d 950, 951 (7th Cir. 2019) ("Whatever may be true of spontaneous or victimless crimes, a person convicted of fraud is not the sort of law-abiding, responsible citizen to whom *Heller* referred."), *and with Kanter*, 919 F.3d at 466 n.15 (Barrett, J., dissenting) (discussing the ability of "Congress and state legislatures to expand the number of qualifying nonviolent offenses," such as stealing a lollipop as discussed in *United States v. Phillips*, 827 F.3d 1171, 1176 n.5 (9th Cir. 2016)). The second—hoplophobia—which I admittedly had to look up, strikes me more as divination, or accusation; if true, it's an apprehension courts will not likely ameliorate.

intermediate appellate courts responsibly assess facts and reasons and distill cohesive law, doing our best to decide the significant liberty interests—and consequences—of the Second and Fifth Amendments.

Of course, I am cautious also about invalidating laws enacted through our democratic process, in place for over half a century, because federal judges disagree with each other about what the relevant historical analogue is and, here, two of us declare we are "unable to find" one. However, I also recognize these very same laws expose many Americans to additional convictions and sentences. Almost twenty million Americans have felony convictions. Thus, I am even more cautious about our court's piecemeal approach to the § 922(g)(1) landscape, which provides little notice to these Americans of the serious recidivism consequences they could face. Furthermore, as Justice Alito recognized, "[t]ens of thousands of prisoners are currently serving sentences for violating [§ 922(g)]." *Rehaif v. United States*, 588 U.S. 225, 260 (ALITO, J., dissenting). [10]

Compounding this caution, I fear we repeat a methodological error similar to our court's in *Rahimi*. In colonial America, women, like children, were property. Today, of course, they can be crime victims. But as the Supreme Court corrected us, that development does not mean there is no

_____

[10] Presumably, if Cockerham had still been on probation or if he had not repaid the child support, either fact would validate his conviction and lifetime ban per the majority's reasoning. Our statutorily constrained task is to consider predicate convictions, which have necessarily occurred in the past and been served by the time a § 922(g)(1) charge is brought. But the majority today looks beyond this conviction to presumably consider whether it is still a present issue, at least in the debt context. But in so doing, it renders the conclusion that a *certain* type of thief, if you adopt the government's plausible analogue, may no longer be considered a thief once restitution, or the equivalent, is paid. Regardless, our law does not explain or give current notice of these incarcerative distinctions to Americans—nor does it tell district judges how to revise pattern jury instructions for this extensively used criminal statute, so that jurors can adjudicate guilt, as opposed to constitutional infringement.

historical analogue to find and reason from.  It just means harder effort and reasoning are required, which is the task we should expect on remand.  As in *Rahimi*, pertaining to misdemeanants who long ago could batter women with impunity, because women were chattel, so too here children once were chattel whose support could be embezzled because none was owed.  One sounds in violence; the other, in theft—both may not have historical twins, but analogues.  My point derived from *Rahimi* is the Court's sensible reminder that we should not confess historical consternation or inability simply because children, like women, once were property and depredations went unpunished.  This is underscored at present, because Cockerham's felony predicate under Mississippi law does not carry the tenor of debt or financial crimes even; instead, it characterizes the crime as "desert[ing] or willfully neglect[ing] or refus[ing] to provide for the support and maintenance of his or her child . . . ." Miss. Code Ann. § 97-5-3.

Finally, my concern about two judges summarily invalidating the application of federal criminal law, which has provided for public safety, been enforced by thousands of judges, and been validated by the Supreme Court repeatedly, has a third reason for salience.  If Cockerham had pled guilty in *any* other circuit, his conviction would stand.  That's because in at least six circuits all felons are on notice that they cannot possess firearms. *See Mancilla*, 155 F.4th at 454 n.5 (Elrod, C.J., concurring).  And in two others, defendants like Cockerham—with Presentence Report facts he did not object to, including aggravated and domestic violence, as well as drug trafficking while possessing this very firearm—also would stay incarcerated due to "individualized determinations of dangerousness." *Id*.  I recognize that these circuits diverge from our circuit's current approach.  But I raise this split to underscore that it is intolerable to have Americans incarcerated

elsewhere for conduct that is constitutionally protected in our corner of the country.[11]

For these reasons—above all, my continuing discomfort that similarly situated Americans are being prosecuted and incarcerated dissimilarly, in addition to our disservice to front-line district judges, much less Americans like Cockerham, as to what list of predicate convictions turn constitutionally protected gun possession into a felony criminal offense—I respectfully dissent.

---

[11] Even if I were to label Cockerham's prior felony offense just as bad as debt, *contra Bryant*, 567 So.2d at 236, this legerdemain risks making § 922(g)(1) vague. What American, with a felony conviction who wants to be law-abiding yet "bear arms," has the crystal ball we pull out every time we announce a new category of qualifying predicate convictions? My worry is that we, unlike every other court of appeals, are categorizing "dangerousness" to avoid hard history work. Of course, dangerousness has its statutory place in the criminal justice process. Some prior convictions trigger rebuttable presumptions regarding pretrial detention pursuant to the Bail Reform Act. And some convictions trigger enhanced sentencing pursuant to the Armed Criminal Career Act. These acts have statutory basis and, regardless, regulate non-guilt determinations; more importantly, each has been approved by the Supreme Court. Contrastingly, our invention flatly contradicts Congress's statutory text; it stands in very sharp friction with repeated Supreme Court caution; and we are trying to constitutionalize dangerousness into felony guilt. To be clear, dangerousness may well be a decisive public safety, limiting principle. But so might restoration of gun rights after a relatively short period for felons, as in Texas and Louisiana. *See, e.g.*, Tex. Penal Code Ann. § 46.04(a); La. Rev. Stat. Ann. § 14:95.1(c). Furthermore, even Americans who were violent once may well not stay dangerous forever, just as some felons with non-violent convictions may continue to present grave public danger, like Al Capone. *See* F. Lee Francis, *The Mutability of Dangerousness: Domestic Violence and Second Amendment Restoration After* Rahimi, 78 SMU L. Rev. 319, 336–37 (2025). My disagreement is that courts are not the branch of government to make these decisions outright, but instead the branch to test the constitutional bounds of such decisions. These are important questions.